IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

CALVIN BROWN,
Petitioner,

vs. Case No.: 4:18cv500/MW/EMT

MARK S. INCH,
Respondent.
_________________________________/

**REPORT AND RECOMMENDATION**

This cause is before the court on Petitioner's petition for writ of habeas corpus filed pursuant to 28 U.S.C. § 2254 (ECF No. 1). Respondent filed an answer and relevant portions of the state court record (ECF No. 13). Petitioner filed a reply (ECF No. 17).

The case was referred to the undersigned for the issuance of all preliminary orders and any recommendations to the district court regarding dispositive matters. *See* N.D. Fla. Loc. R. 72.2(B); *see also* 28 U.S.C. § 636(b)(1)(B), (C) and Fed. R. Civ. P. 72(b). After careful consideration of all issues presented by the parties, it is the opinion of the undersigned that no evidentiary hearing is required for the disposition of this matter, Rule 8(a), Rules Governing Section 2254 Cases. It is

further the opinion of the undersigned that the pleadings and attachments before the court show that Petitioner is not entitled to relief.

## I. BACKGROUND AND PROCEDURAL HISTORY

The relevant aspects of the procedural background of this case are established by the state court record (*see* ECF No. 13).[1] Petitioner was charged in the Circuit Court in and for Leon County, Florida, Case No. 2012-CF-1496, with one count of trafficking in hydrocodone (Count I) and one count of resisting an officer without violence (Count II) (Ex. A at 9). On June 4, 2014, a jury found Petitioner guilty of both charges, after deliberating for 17 minutes, with a specific finding that the trafficking charge involved an amount of hydrocodone weighing 14 grams or more but less than 28 grams (Ex. A at 62–64, Ex. B 1–163). The same day, the court sentenced Petitioner to a mandatory term of fifteen (15) years in prison on Count I and a concurrent term of 11 months and 29 days on Count II, with pre-sentence jail credit of 757 days (Ex. A at 68–77, Ex. B at 164–78).

[1] Hereinafter all citations to the state court record refer to the exhibits submitted with Respondent's answer (ECF No. 13). If a cited page has more than one page number, the court cites to the "Bates stamp" page number.

Petitioner filed a motion to correct sentencing error, pursuant to Rule 3.800(b)(2) of the Florida Rules of Criminal Procedure (Ex. D at 146–61). The trial court summarily denied the motion on March 9, 2015 (*id.* at 162–64).

Petitioner, through counsel, appealed the sentence to the Florida First District Court of Appeal ("First DCA"), Case No. 1D14-2989 (Ex. E). The First DCA affirmed the judgment and sentence per curiam without written opinion on September 22, 2015 (Ex. H). *Brown v. State*, 174 So. 2d 997 (Fla. 1st DCA 2015) (Table). The mandate issued October 8, 2015 (Ex. H).

On March 7, 2016, Petitioner filed a motion for post-conviction relief in the state circuit court, pursuant to Rule 3.850 of the Florida Rules of Criminal Procedure (Ex. K at 3–27). The circuit court appointed counsel to represent Petitioner and held an evidentiary hearing on all of Petitioner's claims (*id.* at 41, 48–120). The state circuit court denied the Rule 3.850 motion on May 30, 2017 (*id.* at 42–43). Petitioner appealed the decision to the First DCA, Case No. 1D17-2614 (Ex. L). The First DCA affirmed the circuit court's decision per curiam without written opinion on August 10, 2018 (Ex. N). *Brown v. State*, 252 So. 3d 151 (Fla. 1st DCA 2018) (Table). The mandate issued October 3, 2018 (Ex. N).

Petitioner filed the instant federal habeas action on October 29, 2018 (ECF No. 1).

## II. STANDARD OF REVIEW

Federal courts may grant habeas corpus relief for persons in state custody pursuant to 28 U.S.C. § 2254. Section 2254(d) provides, in relevant part:

> **(d)** An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
> > **(1)** resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > **(2)** resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d) (2011).

The United States Supreme Court explained the framework for § 2254 review in *Williams v. Taylor*, 529 U.S. 362, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000). The appropriate test was described by Justice O'Connor as follows:

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Id.*, 529 U.S. at 412–13 (O'Connor, J., concurring).

Employing the *Williams* framework, on any issue raised in a federal habeas petition upon which there has been an adjudication on the merits in a state court proceeding, the federal court must first ascertain the "clearly established Federal law," namely, "the governing legal principle or principles set forth by the Supreme Court at the time the state court render[ed] its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71–72, 123 S. Ct. 1166, 155 L. Ed. 2d 144 (2003). The law is "clearly established" only when a Supreme Court holding at the time of the state court decision embodies the legal principle at issue. *Thaler v. Haynes*, 559 U.S. 43, 47, 130 S. Ct. 1171, 175 L. Ed. 2d 1003 (2010); *Woods v. Donald*, — U.S. —, 135 S. Ct. 1372, 1376, 191 L. Ed. 2d 464 (2015) ("We have explained that clearly established Federal law for purposes of § 2254(d)(1) includes only the holdings, as opposed to the dicta, of this Court's decisions." (internal quotation marks and citation omitted)).

After identifying the governing legal principle(s), the federal court determines whether the state court adjudication is contrary to the clearly established Supreme Court case law. The adjudication is not contrary to Supreme Court precedent merely because it fails to cite to that precedent. Rather, the adjudication is "contrary" only if either the reasoning or the result contradicts the relevant Supreme Court cases. *See Early v. Packer*, 537 U.S. 3, 8, 123 S. Ct. 362, 154 L. Ed. 2d 263 (2002). Where

there is no Supreme Court precedent on point, the state court's conclusion cannot be

contrary to clearly established federal law. *See Woods*, 135 S. Ct. at 1377 (holding,

as to claim that counsel was per se ineffective in being absent from the courtroom

for ten minutes during testimony concerning other defendants:  "Because none of

our cases confront the specific question presented by this case, the state court's

decision could not be contrary to any holding from this Court." (internal quotation

marks and citation omitted)).  If the state court decision is contrary to clearly

established federal law, the federal habeas court must independently consider the

merits of the petitioner's claim. *See Panetti v. Quarterman*, 551 U.S. 930, 954, 127

S. Ct. 2842, 168 L. Ed. 2d 662 (2007).

If the "contrary to" clause is not satisfied, the federal habeas court next

determines whether the state court "unreasonably applied" the governing legal

principles set forth in the Supreme Court's cases.  The federal court defers to the

state court's reasoning unless the state court's application of the legal principle(s)

was "objectively unreasonable" in light of the record before the state court.

*Williams*, 529 U.S. at 409; *see Holland v. Jackson*, 542 U.S. 649, 652, 124 S. Ct.

2736, 159 L. Ed. 2d 683 (2004) (per curiam).  In applying this standard, the Supreme

Court has emphasized:

> When reviewing state criminal convictions on collateral review, federal judges are required to afford state courts due respect by overturning their decisions only when there could be no reasonable dispute that they were wrong. Federal habeas review thus exists as "a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." *Harrington*, *supra*, at 102–103, 131 S. Ct. 770 (internal quotation marks omitted).

*Woods*, 135 S. Ct. at 1376 (quoting *Harrington v. Richter*, 562 U.S. 86, 131 S. Ct. 770, 178 L. Ed. 2d 624 (2011)).

Section 2254(d) also allows federal habeas relief for a claim adjudicated on the merits in state court where that adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). The "unreasonable determination of the facts" standard is implicated only to the extent the validity of the state court's ultimate conclusion is premised on unreasonable fact finding. *See Gill v. Mecusker*, 633 F.3d 1272, 1292 (11th Cir. 2011). As with the "unreasonable application" clause, the federal court applies an objective test. *Miller-El v. Cockrell*, 537 U.S. 322, 340, 123 S. Ct. 1029, 154 L. Ed. 2d 931 (2003) (holding that a state court decision based on a factual determination "will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state court proceeding."). Federal courts "may not characterize . . . state-court factual determinations as unreasonable merely because we would have reached a

different conclusion in the first instance." *Brumfield v. Cain*, — U.S. —, 135 S. Ct. 2269, 2277, 192 L. Ed. 2d 356 (2015) (quotation marks omitted).

When performing review under § 2254(d), the federal court presumes that all factual determinations made by the state court are correct.  28 U.S.C. § 2254(e)(1). The petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence."  *Id.*; *see, e.g.*, *Miller-El*, 537 U.S. at 340 (explaining that a federal court can disagree with a state court's factual finding and, when guided by the AEDPA, "conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence").

Only if the federal habeas court finds that the petitioner satisfied § 2254(d), does the court take the final step of conducting an independent review of the merits of the petitioner's claim.  *See Panetti*, 551 U.S. at 954.  Even then, the writ will not issue unless the petitioner shows that he is in custody "in violation of the Constitution or laws and treaties of the United States." 28 U.S.C. § 2254(a).  "If this standard is difficult to meet, that is because it was meant to be." *Richter*, 562 U.S. at 102.

Within this framework, the court will review Petitioner's claims.

## III.    PETITIONER'S CLAIMS

A. Ground One: "Ineffective assistance of trial counsel for misadvising Defendant as to his sole affirmative defense, in violation of the U.S. Const. 6th Amend."

Ground Two: "Ineffective assistance of trial counsel for misadvising Defendant not to testify in his own defense, in violation of the U.S. Const. 6th Amend."

Ground Three: "Ineffective assistance of trial counsel for misadvising and failing to procure the attendance of a crucial witness for his trial violation [sic] of his 6th U.S. Amend. rights."

Ground Four: "The cumulative effect of trial counsel's deficient performance prejudiced the Defendant."[2]

Petitioner alleges his sole defense was a "prescription defense," but defense counsel erroneously advised him it was not a viable defense and instead pursued a sympathy/jury nullification defense (ECF No. 1 at 5, 7, 8; ECF No. 17 at 5–12).[3] Petitioner alleges prior to trial, he told defense counsel that the loose hydrocodone pills found in his pocket belonged to his sister, Margaret Bryant, who had a prescription for the pills, and that she left the pills at Petitioner's residence "for him to possess" (ECF No. 17 at 10). Petitioner alleges Ms. Bryant would have testified she had a valid prescription for "at least 15 pills" (*id.*). Petitioner alleges defense

[2] Petitioner's first four claims are closely related, therefore, the court will consolidate its discussion of them.

[3] When referencing the parties' pleadings, the court refers to the page numbers automatically assigned by the court's electronic filing system.

counsel advised him that Ms. Bryant's testimony would not support any defense (*id.*).

Petitioner also alleges defense counsel misadvised him with respect to testifying on his own behalf (ECF No. 17 at 8). Petitioner alleges during trial, defense counsel advised the court that Petitioner intended to testify (*id.*). Petitioner alleges the trial court conducted a colloquy, during which the court advised Petitioner that he would be required to answer questions truthfully, including whether he had any prior convictions (*id.*). Petitioner alleges he decided not to testify, but his decision was based upon defense counsel's failure to advise him that although the prosecutor could inquire about the number of his prior convictions, the prosecutor could not inquire about any pending charges (*id.* at 9). Petitioner alleges if counsel had advised him about these limitations, he would have testified (*id.*). Petitioner also alleges counsel misadvised him that his testimony would not support a prescription defense (*id.* at 8).

Petitioner contends the "total impact" of counsel's error produced a fundamentally flawed trial (ECF No. 1 at 10; ECF No. 17 at 13).

Respondent appears to concede Petitioner exhausted these four claims in the state courts by presenting them in his Rule 3.850 motion (ECF No. 13 at 18–20, 30–32, 39–40). Respondent contends the state court's adjudication of Grounds One,

Two, and Three was not based upon an unreasonable determination of the facts in light of the evidence presented at the evidentiary hearing, nor was the adjudication contrary to or an unreasonable application of clearly established federal law (*id.* at 20–30, 33–39, 40–44).

With respect to Ground Four, Respondent contends the United States Supreme Court has not held that distinct constitutional claims may be cumulated to grant federal habeas relief (ECF No. 13 at 45). Respondent further contends that even if Petitioner's "cumulative effect" claim is cognizable, he is not entitled to relief, because the state court's rejection of the claim was not contrary to or an unreasonable application of clearly established federal law (*id.* at 45–48).

1. Clearly Established Federal Law

The standard for evaluating claims of ineffective assistance of counsel is set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). To obtain relief under *Strickland*, Petitioner must show (1) deficient performance by counsel and (2) a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. *Id.* at 687–88. If Petitioner fails to make a showing as to either performance or prejudice, he is not entitled to relief. *Id.* at 697.

The focus of inquiry under the performance prong of *Strickland* is whether counsel's assistance was reasonable considering all the circumstances and under prevailing professional norms. *Strickland*, 466 U.S. at 688–89, 691. "The petitioner's burden to prove, by a preponderance of the evidence, that counsel's performance was unreasonable is a heavy one." *Jones v. Campbell*, 436 F.3d 1285, 1293 (11th Cir. 2006) (citing *Chandler v. United States*, 218 F.3d 1305, 1313 (11th Cir. 2000) (en banc)). "Judicial scrutiny of counsel's performance must be highly deferential," and courts should make every effort to "eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689. "[T]here are no 'absolute rules' dictating what reasonable performance is . . . ." *Michael v. Crosby*, 430 F.3d 1310, 1320 (11th Cir. 2005) (quoting *Chandler*, 218 F.3d at 1317). Indeed, "'[a]bsolute rules would interfere with counsel's independence—which is also constitutionally protected—and would restrict the wide latitude counsel have in making tactical decisions.'" *Id.* (quoting *Putman v. Head*, 268 F.3d 1223, 1244 (11th Cir. 2001)). Counsel's performance is deficient only if it is "outside the wide range of professional competence." *Jones*, 436 F.3d at 1293 (citing *Strickland*, 466 U.S. at 690); *Lancaster v. Newsome*, 880 F.2d 362,

375 (11th Cir. 1989) (emphasizing that petitioner was "not entitled to error-free representation").

There are "countless ways to provide effective assistance in any given case." *Strickland*, 466 U.S. at 691. "Even the best criminal defense attorneys would not defend a particular client in the same way." *Id.* at 689. Rare are the situations in which the "wide latitude counsel must have in making tactical decisions" will be limited to any one technique or approach. *Id.* "Counsel was entitled to formulate a strategy that was reasonable at the time . . . ." *Richter*, 562 U.S. at 107 (citations omitted); *Ward v. Hall*, 592 F.3d 1144, 1164 (11th Cir. 2010) ("[C]ounsel cannot be adjudged incompetent for performing in a particular way in a case, as long as the approach taken might be considered sound trial strategy."). "Even if many reasonable lawyers would not have done as defense counsel did at trial, no relief can be granted on ineffectiveness grounds unless it is shown that no reasonable lawyer, in the circumstances, would have done so." *Rogers v. Zant*, 13 F.3d 384, 386 (11th Cir. 1994).

The Eleventh Circuit has explained trial counsel's responsibilities regarding a client's right to testify as follows:

> In *Teague*, we specifically delineated the duties of a trial counsel with respect to a defendant's right to testify. Counsel must advise the defendant (1) of his right to testify or not testify; (2) of the strategic

> implications of each choice; and (3) that it is ultimately for the defendant himself to decide whether to testify. *Id.* at 1533.

*McGriff v. Dept. of Corr.*, 338 F.3d 1231, 1237 (11th Cir. 2003) (citing *United States v. Teague*, 953 F.2d 1525, 1532 (11th Cir. 1992)). "[I]f defense counsel believes that it would be unwise for the defendant to testify, counsel may, and indeed should, advise the client in the strongest possible terms not to testify." *Teague*, 953 F.2d at 1533.

With respect to the prejudice prong of the *Strickland* standard, Petitioner's burden of demonstrating prejudice is high. *See Wellington v. Moore*, 314 F.3d 1256, 1260 (11th Cir. 2002). To establish prejudice, Petitioner must show "that every fair-minded jurist would conclude 'that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Jones v. GDCP Warden*, 753 F.3d 1171, 1184 (11th Cir. 2014) (quoting *Strickland*, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome," not that counsel's conduct more likely than not altered the outcome of the proceeding. *Id.* (citation omitted). And Petitioner must show that the likelihood of a different result is substantial, not just conceivable. *Williamson v. Fla. Dep't of Corr.*, 805 F.3d 1009, 1016 (11th Cir. 2015) (citing *Richter*, 562 U.S. at 112). "When a defendant challenges a conviction, the question

is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Strickland*, 466 U.S. at 695. The prejudice assessment does "not depend on the idiosyncracies [sic] of the particular decisionmaker," as the court should presume that the judge or jury acted according to law. *Id.* at 695.

Finally, when a district court considers a habeas petition, the state court's findings of historical facts in the course of evaluating an ineffectiveness claim are subject to the presumption of correctness, while the performance and prejudice components are mixed questions of law and fact. *Strickland*, 466 U.S. at 698; *Collier v. Turpin*, 177 F.3d 1184, 1197 (11th Cir. 1999). "Surmounting *Strickland*'s high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371, 130 S. Ct. 1473, 176 L. Ed. 2d 284 (2010). "Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult." *Richter*, 131 S. Ct. at 788. As the *Richter* Court explained:

> The standards created by *Strickland* and § 2254(d) are both "highly deferential," and when the two apply in tandem, review is "doubly" so. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.

*Id.* (citations omitted).

2. Federal Review of State Court Decision

Petitioner presented all four of these claims in his Rule 3.850 motion (Ex. K at 13–26). The parties presented evidence during the evidentiary hearing in the circuit court, including the testimony of three witnesses, Petitioner, Margaret Brown-Bryant (Petitioner's sister), and Attorney John Eagen (Petitioner's trial counsel) (Ex. K at 48–108). The circuit court also took judicial notice of the trial record, including the trial transcript (*id.* at 47, 68).

Margaret Brown-Bryant testified she is Petitioner's sister (Ex. K at 79). She testified that in early May of 2012, she brought their mother from Donalsonville, Georgia, to Petitioner's home, so he could care for her (*id.* at 80–81). Ms. Bryant testified she brought her mother's clothing and medications (*id.* at 81). Bryant testified she also brought her own medication, specifically, hydrocodone, but she did so accidentally (*id.* at 81–82). Ms. Bryant testified, "It was in a bag, and I didn't know it" (*id.* at 81). Ms. Bryant testified the hydrocodone was in a prescription pill bottle (*id.* at 83–84, 87). Bryant testified that after she put everything in Petitioner's house, Petitioner said he could not take care of their mother, so she hastily left with

her mother and "everything" (*id.* at 82). Ms. Bryant later testified she left some of her things and some of her mother's things behind at Petitioner's house (*id.* at 94).

Ms. Bryant testified that on the day Petitioner was arrested in May of 2012, she learned that he was charged with possession of her prescription pills (Ex. K at 90). When asked how many times she met with Attorney Eagen, Ms. Bryant responded:

> A. If I seen [sic] him, twice. That was the only time. I spoke to Ms. Marilee [sic], his legal assistant.
>
> Q. Okay. Did you talk to him about the facts of the case?
>
> A. I met with him downstairs once, and I asked him. I said, what's going on? We are working on it. But I told Ms. Marilee everything. She was the one taking the money and everything.
>
> Q. Okay. So you would, of course, not know whether or not Mr. Eagen's assistant told him anything.
>
> A. I wouldn't.

(Ex. K at 83–84). Ms. Bryant testified she was present at trial (*id.* at 84). She stated she would have testified that the pills were hers (*id.*).

On cross-examination, Ms. Bryant testified she would have been able to obtain a copy of her prescription, but "Nobody asked for it" (Ex. K at 91, 92). She testified:

> Q [by counsel for the State]. And you didn't bother getting that, knowing that your older brother is facing a minimum mandatory prison sentence of 15 years for being in possession of your pills?
>
> A. Can I speak now?
>
> Q. No. You can answer my question.
>
> A. Okay. I didn't even know anything about mandatory. No, ma'am, I didn't. My mom was still with me and still ill. So, no, ma'am. I didn't know he was facing no [sic] 15 years. I didn't.

(Ex. K at 91).

Upon inquiry by the court, Ms. Bryant testified she left 15 pills, at the most, at Petitioner's house (Ex. K at 95). She testified none of those pills should have been broken in half (*id.*).

Petitioner testified at the post-conviction evidentiary hearing (Ex. K at 96–108). When asked whether he discussed his case with Attorney Eagen prior to hiring him, Petitioner responded that he only told Eagen the nature of the charge (*id.* at 97–98). Petitioner testified Attorney Eagen told him "it didn't sound like trafficking," and that he probably could get Petitioner into rehab because of his addiction (*id.* at 98). Petitioner testified he removed approximately 22 of his sister's pills from the prescription bottle and put them in his pocket, because there were small children in the house (*id.* at 98–99). He testified he threw away the prescription bottle (*id.* at 104). Petitioner testified he told Attorney Eagen that the pills were his sister's, and

asked Eagen to call his sister as a witness to testify to that, but Eagen responded that the fact that the prescription was in his sister's name was no excuse for Petitioner to have them (*id.* at 100, 103).  Petitioner testified if he had known about the prescription defense, he would have testified and explained the circumstances of why the pills were in his pocket (*id.* at 107–08).

Attorney Eagen testified he had been an attorney for 27 years, practicing criminal defense the vast majority of those years (Ex. K at 52).  Eagen testified Petitioner told him he was a military veteran and had injured his back during his military service (*id.* at 54).  Eagen testified Petitioner told him that a doctor at the VA had prescribed pain medication, but his prescription was no longer available to him (*id.*).  Attorney Eagen testified Petitioner "absolutely" told him he was addicted to pain medication and using his sister's pills himself (*id.* at 54, 70).  Attorney Eagen testified he and Petitioner's sister talked a lot about Petitioner's addiction (*id.* at 57).  Eagen testified that, to his knowledge, at the time of the offense, Petitioner was no longer receiving pain medication from his doctors at the VA (*id.*).

Attorney Eagen recalled that the defense strategy he discussed with Petitioner was to appeal to the jury's sympathy and empathy by suggesting that Petitioner possessed the hydrocodone pills to satisfy his addiction to pain-relief medication, which he had previously been prescribed for injuries he sustained in military service

(Ex. K at 54, 65–66). Attorney Eagen testified Petitioner was a "very sympathetic defendant," and "that was . . . what we were going for" (*id.* at 71–72). Eagen acknowledged that sympathy for Petitioner's addiction was not a defense per se; but based upon his experience, the absence of any viable affirmative defense, and the fact that Petitioner had rejected the State's plea offer, he (Eagen) believed that the only chance of avoiding a conviction was to hope that the jury would feel sympathy for Petitioner:

> Q [by Petitioner's post-conviction counsel]. Now, absent the fact that you are not allowed to put on any evidence about his addiction or anything like that, was there any defense whatsoever, that you were presenting?
>
> A. . . . I was trying to portray him as a sympathetic person, as someone who I thought the jury would feel sympathetic towards.
>
> Q. But you know that the judge instructed the jury not to have—
>
> A. Well, I—
>
> Q. —any sympathy.
>
> A. Well, you know, that—you know—and you know as well as I do, Mr. Gardner, the juries, they are told all the time that they are not to decide a case whether they like somebody or they don't like somebody or they're sympathetic towards somebody.
>
> But you know perfectly well, as you're standing there, that juries look at a defendant and they make a determination in their minds of how they feel about. . . that defendant and whether or not they're going to convict him.

> So, I mean, yes, they can instruct the jury all they want and say, don't feel sympathy, don't feel this. But you know, if your client's sitting over there with a teardrop tattoo on his face and he's on trial for something, that that jury is going to convict him no matter what your defense is.
>
> And that's not Mr. Brown. And Mr. Brown didn't appear, to me, or act or appear to the jury as someone who was doing the crimes that he was accused of.
>
> So, yes. I'm well aware of the jury instructions of what they're not allowed to do. But I've been doing this for years, and I, I deal with the reality of what a jury will do.

(Ex. K at 55, 75–76).

Attorney Eagen testified he was aware that a prescription defense was a valid defense to the crime of possession, and that there was an "agency exception" in law, but the defense was viable only if there was a factual basis to support it (Ex. K at 57–58, 61–62). Eagen testified:

> Q [by counsel for the State]. If he had told you, I was just lawfully holding these for my sister, who has a valid prescription, as a defense attorney, wouldn't you have just stood up and shouted, hooray, thank goodness, we've got a great defense here?
>
> A. Well, I think if it—if that had occurred, yeah.
>
> Q Okay. So is it safe to say—
>
> A. But I don't, I don't [sic]—and I don't recall that that's the circumstances that occurred.

Q.  And you don't recall being excited that you had this defense he told you about, right?

A.  Well, Ms. Norris, over 27 years, if I have a good defense, I do get excited.  But—and it's not my practice to just let a viable defense just go by the wayside just because I want to go to trial.
. . . .
Q  Is it safe to say that you would have latched onto that and tried to explore whether or not that was a possibility as a defense in this case?

A.  I have a duty to do any viable defense that's legally possible and that I can find a legal basis to pursue.

Q.  Okay.  So going back to your recollection, you do—you stated you do not recall him stating his sister had a prescription.

A.  I don't recall that.

Q.  Do you recall him telling you he was holding them for his sister, who had the valid prescription?

A.  I don't recall that either.

Q.  Do you recall him telling you his sister left the pills with him for safekeeping so that she didn't have to go through the trouble of packing them next time she came to visit him?

A.  I definitely don't recall that.  There was no conversation of that nature whatsoever.

Q.  Do you ever recall telling Mr. Brown that this agency relationship prescription defense was not available, that that was not the law?

A.  No.  I don't recall telling him that.  I—

Q.  Would you have told him that?

> A. . . . I don't recall that we ever really went into this whole thing with his sister and the pills and . . . he was holding them for her or anything else of that nature.

(Ex. K at 62–64).  Eagen testified there was no evidence of a prescription bottle, let alone one bearing the name of Petitioner's sister (*id.* at 60, 66–67).

Attorney Eagen testified that an agency-based prescription defense would have been inconsistent with everything Petitioner had told him (Ex. K at 70–71). Eagen further testified that any such defense was undermined by the evidence that Petitioner attempted to discard the pills when law enforcement approached him, by reaching into his pocket and scattering the loose pills, an action which Attorney Eagen described was "inconsistent to saying, yes, I have a lawful prescription for this, so why am I throwing them away" (*id.* at 67).

When asked whether he advised Petitioner not to testify, Attorney Eagen stated:

> I never tell anybody not to testify.  I tell them—I go through the—as I do in every case, that—the, the [sic] pitfalls of testifying, you know, the downside, whether—if he had a prior conviction, . . . he would have to at least . . . tell the jury that he has X amount of convictions and that . . . the State can't go into them unless . . . he says he only has five but he really has nine.  Then—you know, so he has to be truthful.  And we always usually agree on the number prior to him testifying.  I usually make sure that we stipulate to how many convictions so there's no confusion.  But, obviously, it's his decision whether to testify.

. . . .

I would never tell someone not to testify.

(Ex. K at 64–65).

Attorney Eagen testified that if Petitioner took the stand and testified he was not using the pills but just "holding" them for his sister, it would have been contrary to what Petitioner told him:

> Q [by counsel for the State]  Based on your conversations with Mr. Brown, you believed that he—he, in fact, told you he had an addiction and was using the pills himself, didn't he?
>
> A.  Oh, absolutely.
>
> Q.  So you knew that if he were to get up there and say, I'm not using them, they weren't mine, I don't have a pill problem, I was just holding them for my sister, that would be perjured testimony, correct?
>
> A.  Well, it would have been against what I—yes.  I, I [sic] wouldn't say it was perjury, but it would definitely not be what I knew . . . from talking to Mr. Brown.
> . . . .
> That he did have it—he had a very bad addiction.

(Ex. K at 70).  Attorney Eagen testified that if Petitioner was using the pills he possessed to support his addiction, this fact would have negated any defense that he was simply "holding" them for his sister (*id.* at 68–70).  Eagen further testified that presenting a flimsy defense would have risked losing the jury's perception of Petitioner as credible and worthy of their sympathy and empathy (*id.* at 70–72).

Attorney Eagan testified that even if Petitioner had told him he was "holding" the pills for his sister, Eagan still would not have presented a prescription defense (*id.* at 72–73).

As previously noted, the trial transcript was part of the state post-conviction record. With respect to Petitioner's decision not to testify, the trial transcript demonstrates that Petitioner made his decision after he and Attorney Eagen were forewarned that the trial court would limit the subject matter of Petitioner's testimony on direct, and allow the State to question Petitioner about certain matters if Petitioner "opened the door." After the State rested its case, the prosecutor made a motion to exclude testimony from Petitioner which was designed solely to evoke sympathy from the jury. The following discussion occurred with Petitioner present, but outside the presence of the jury:

> MS. NORRIS [the prosecutor]: . . . I would move in limine from the defendant getting up and under .403 arguing sympathy, I was an addict, and trying to evoke feelings of sympathy, that they're going to nullify the law because they're sorry for him that he had an addiction because it is not relevant to the issues before the jury and it serves no purpose but to either encourage them to nullify the law, encourage them to base an opinion on sympathy, and I think it's inadmissible. It's clearly more prejudicial than it is probative and it's unfairly prejudicial to the State to allow irrelevant evidence in.
>
> MR. EAGEN: I think the jury has a right to know who they're judging and who Mr. Brown is.

THE COURT:  As long as it's a legal defense, Mr. Eagen.  But the fact that he's addicted to something that he's not supposed to be in possession of or he doesn't have a prescription for is not a defense.

He's charged with trafficking in hydrocodone, which means that, in effect, the State has to prove, one, he had it, he was in actual or constructive possession; two, it was hydrocodone; and, three, it was more than 14 grams.  They don't then have to come in and rebut the fact that he had it because he had back pain.  It's not relevant.
. . . .
He can testify as to how he came up with it.  And he can testify that, hey, I wasn't selling it, I was just using it myself.
. . . .
But he can't try to defend himself based upon addiction because it's not a defense to possession or trafficking.

MR. EAGEN:  I understand that.  But, even with the fact that addiction is not a legal defense, I think him going through—even if I don't ask him about addiction, but I go through his life, where he came from, the military, being injured, being on this prescription, and then getting off the prescription and doing what he did or he does what he did to get pills and whether he knew how much pills he had, etc., I think·that the jury is entitled to know that.

THE COURT:  If you open that door, Mr. Eagen, I'm going to let Ms. Norris go rushing right through it because you're putting his character in evidence, you're putting his past medical history in evidence.  And if he says, well, I got these pills whatever, whatever, I'm going to let her say, well, isn't it true you got a prescription that you sold so that you could get these prescription pills without a prescription?

So, you know, it's a two-way street.

MR. EAGEN:  Well, I know it's a two-way street.  But, I mean, also this man's life is at stake.

THE COURT:  Well, I understand.

MS. NORRIS:  Your Honor, if Mr. Eagen is referring to a prescription defense, he can present that evidence.  I have been disclosed in discovery all the prescription records, none of which, Your Honor, none of which included hydrocodone, which is the drug in this case.

I would also be then allowed to go into the undercover buy on May 10th and I would call Detective Brunner to come testify that he did a controlled buy with Mr. Brown where he sold hydrocodone to him.  And I think Mr. Eagen has been yet to be able to identify any relevant basis for any of this besides sympathy.

THE COURT:  I can't say that Mr. Brown can't testify.  He has an absolute right to do that.  I will tell you, Ms. Norris, based upon a well-placed objection, I will rule.

And I'm telling Mr. Eagen at this point in time that I'm not going to allow addiction to be used as a defense in this case because it's not a legal defense.

Now, if he wants to testify, yes, I'm a war veteran, I got hurt in the war or whatever it is he's going to testify to, he's entitled to testify.  Constitutionally, I can't stop him from testifying.  But I can sustain an appropriate objection if the testimony is not relevant and if it is not something that should be before this jury.

I can't presuppose what he's going to testify to.  If he wants to take the stand, he certainly has that right .
. . . .
Is he going to take the stand?

MR. EAGEN:  One moment.

I'm going to ask, specifically, we agreed he has seven prior felonies?

MS. NORRIS:  Absolutely, yes, I'll stick to that.

MR. EAGEN:  So we're going to stipulate that he has seven prior felonies.  If·he testifies, that's what he's going to testify to.

We're not going to go into the basis or the nature of the other charges because he's not denying he had seven felonies.

THE COURT:  So at this point in time, it's his intent to take the witness stand?

MR. EAGEN:  Yes, Your Honor, at this time, it is.

. . . .

MS. NORRIS:  Just for record purposes, . . . if he does testify he didn't know better or anything to that effect, I will open the door with prior drug sales of the exact same drug.

(Ex. B at 80–85).

The trial judge then conducted a sworn colloquy with Petitioner:

THE COURT:  Mr. Brown, you have an absolute right, you heard me say that just a few minutes ago, to become a witness in this case, guaranteed by the Constitution.

THE DEFENDANT:  Yes.

THE COURT:  Do you understand that?

THE DEFENDANT:  Yes, sir.

THE COURT:  And do you understand that that is one of the decisions in a criminal case that you get to make?  Your lawyer can give you advice, but the bottom line is you make the determination as to whether to become a witness or not in this case.  Do you understand? You have to answer out loud.

THE DEFENDANT:  Yes, sir.

THE COURT:  And do you understand that if you do become a witness in this case, I will instruct the jury that they're to consider your testimony in accordance with the rules that they consider everybody else's testimony.  Just because you're on trial here doesn't mean they are to consider automatically that you're not credible, that you're not telling the truth.  Do you understand?

THE DEFENDANT:  Yes, sir.

THE COURT:  On the other hand, I've already instructed them, and I will again if you decide not to become a witness in this case, I will instruct them they can't read anything into that, they can't use that against you, you have the absolute right to remain silent.  Do you understand?

THE DEFENDANT:  Yes.

THE COURT:  And you understand that if you take the witness stand, not only are you subject to testimony from Mr. Eagen's questions, but you're subject to being cross-examined by Ms. Norris?

THE DEFENDANT:  Yes, sir.

THE COURT:  And, as indicated right now, this jury has no idea whether you have any prior convictions or not.  But, if you take the witness stand, they will because you're going to be asked if you have any prior convictions and you're going to have to say yes and they're going to say, how many, and you're going to say seven.

And then, when it comes to instructing the jury, I'm going to instruct them, as far as credibility of a witness is concerned, they can consider whether you have any prior conviction.  Do you understand that?

THE DEFENDANT: Yes, sir.

THE COURT: So, all of that comes into play when you're making the decision to take the witness stand. Do you understand?

THE DEFENDANT: Yes, sir,

THE COURT: And you're telling me at this point in time that you've considered all of those variables and that it is your decision and yours alone to become a witness in this case?

THE DEFENDANT: Can I have a moment, please?

(PAUSE)

. . . .

MR. EAGEN: . . . I've talked it over with Mr. Brown and, based on the Court's warnings and basically giving him the knowledge of what he could expect, I think your decision is not to testify?

THE DEFENDANT: That is correct.

THE COURT: All right. So, Mr. Brown, we've talked here. We've had some discussions. Your lawyer has had time to talk with you during the break. And you have now changed your mind and you do not want to become a witness in this case. Is that correct?

THE DEFENDANT: Yes, sir.

THE COURT: And that is your decision, everybody's advised you, we've told you what the law is, we've had a long discussion about it, but it's your decision and you have made the decision not to become a witness in this case?

THE DEFENDANT: Yes, sir.

(Ex. B at 85–94).

In Attorney Eagen's opening statement, which he reserved for after the State rested its case, Eagen acknowledged that the evidence presented thus far showed that law enforcement officers found prescription medication of a certain kind and a certain weight in Petitioner's possession (*see* Ex. B at 20, 101–02). Eagen stated that even though the jury may never know how and why those circumstances came about, Petitioner believed that the jury would "give him justice" (*id.*).

Attorney Eagen then called Detective Brunner as a witness, and elicited testimony that at the time he approached Petitioner, Petitioner was standing in the yard of a residence and started walking toward the front door of the residence (Ex. B at 22–24, 103, 105). Eagen elicited Detective Brunner's testimony that at the time officers discovered hydrocodone in Petitioner's pocket, Petitioner did not have a current prescription for that particular drug, but he had prescriptions for other drugs (*id.* at 108). And Eagen elicited testimony that Brunner did not know whether there were any old prescriptions in the house, thus inviting the jury to believe that there may have been prescriptions (*id.* at 109).

During closing arguments, Attorney Eagen argued that the jury should not accept the State's interpretation of the evidence, specifically with respect to whether Petitioner knowingly possessed the illegal drugs in the quantity of which he was accused (Ex. B at 121–26). And Eagen suggested there were other reasons Petitioner

was found with pills in his pocket (*id.*).    Eagen urged the jury to make a determination that they felt was just and in accordance with the law (*id.*).

The circuit court made the following oral findings at the conclusion of the post-conviction evidentiary hearing

> [I]t's clear Mr. Eagen made strategic decisions to put on the defense that he did, which was a jury nullification/sympathy defense.  He made a strategic decision that it wasn't wise to use any type of prescription defense, that it wasn't credible and that it would only hurt him in the end.
>
> He—Mr. Eagen did present some evidence of potential prescriptions through Detective Brunner to sort of dovetail with his defense of the lack of proof on the State's part and the sympathy/addiction factor.
>
> So I'm going to find that there's no deficient performance related to all four counts and that there's no prejudice.  The court also did go through very extensive colloquies with the defendant at the end of the trial, pages 148 to 150 of the record.  And then, also, specifically related whether the defendant was going to testify. And that's at pages 85 through 94, when the court discussed with the defendant the fact that if he did testify about certain things, that would likely open the door to the sale that had occurred not long before, where Detective Brunner made an undercover buy from the defendant on May 10th.
>
> I also find that both the defendant and the sister's testimony were not credible.  She testified that there—at most, there were 15 pills in the bottle that she left.  However, both Investigator Brunner and the FDLE expert, Catalani, testified that there were over 17 pills.  Brunner testified there were 17 whole pills and two halves.  And Catalani testified that there were 17 whole pills and one half.

> But, either way, there was at least one half of a pill in there. She said that she always took whole pills and that there were 15 at the most. So that's certainly inconsistent with the actual facts in this case. And I otherwise just found their testimony not very credible. And Mr. Eagen's, conversely, was credible.
>
> So I'll follow that up with a written order . . . .

(Ex. K at 118–19). In the circuit court's subsequent written decision denying all of Petitioner's claims, the court correctly stated the deficient performance and prejudice prongs of the *Strickland* standard as the applicable legal standard (*id.* at 42). The court denied all of Petitioner's claims for the reasons stated on the record at the evidentiary hearing (*id.* at 43). The First DCA affirmed the circuit court's decision without written opinion (Ex. N).

In *Wilson v. Sellers*, — U.S. —, 138 S. Ct. 1188, 200 L. Ed. 2d 530 (2018), the Supreme Court held that where there has been one reasoned state judgment rejecting a federal claim followed by a later unexplained order upholding that judgment or rejecting the same claim, federal habeas courts should "look through" the unexplained decision to the last related state-court decision that does provide a relevant rationale. *Id.* at 1192. The federal court should then presume that the unexplained decision adopted the same reasoning. *Id.*

Fairminded jurists could agree with the state court's determination that Attorney Eagen was not ineffective for failing to pursue and present an agency-based

prescription defense. Attorney Eagan would not have been aware of a factual basis for this defense unless Petitioner or his sister notified Eagen of such facts. Attorney Eagen testified Petitioner told him he was addicted to pain medication and using his sister's pills himself. Eagen further testified that neither Petitioner nor his sister advised him of facts which formed the basis for a viable agency-based prescription defense, i.e., that Petitioner was holding his sister's hydrocodone pills on her behalf.[4] Eagen testified that an agency-based prescription defense would have been inconsistent with everything Petitioner had told him. The state court found that Attorney Eagen's testimony at the evidentiary hearing was credible, and that the testimony of both Petitioner and Ms. Bryant was not credible. Petitioner has not shown by clear and convincing evidence that the court's credibility determinations were unreasonable. Considering Attorney Eagen's testimony, the state court reasonably concluded that Attorney Eagen was not deficient for failing to pursue an agency-based prescription defense, including presenting testimony in support of this defense at trial (i.e., testimony from Petitioner's sister).

[4] In Florida, the prescription defense is available to a defendant charged with possession of a controlled substance who has a valid prescription written directly on the defendant's behalf for the controlled substance in the defendant's possession. *See McCoy v. State*, 56 So. 3d 37, 39 (Fla. 1st DCA 2010). A prescription defense is also available to an innocent possessor of a controlled substance who has a legally recognized reason for the possession of controlled substance prescribed to another individual. *See id.*

Fairminded jurists could also agree with the state court's determination that Attorney Eagen was not ineffective for failing to advise Petitioner, during their discussion of whether Petitioner should testify, of the availability of an agency-based prescription defense.  Petitioner contends he would have testified at trial if Eagen had advised him of this defense.   But considering Attorney Eagen's credible testimony that he was not made aware of any facts which formed the basis for a viable agency-based prescription defense, Eagen's failure to advise Petitioner of this defense was not deficient.  And even if Petitioner had told Eagen the facts to which Petitioner testified at the post-conviction evidentiary hearing (that his sister left her pills at Petitioner's house, and he put them in his pocket to keep them out of reach of children in the home), a competent attorney still would have advised Petitioner not to testify, since the story was unbelievable (especially considering the evidence that Petitioner attempted to dispose of the pills when law enforcement approached him), and presenting it would have risked losing credibility and goodwill with the jury.  Moreover, Attorney Eagen's eliciting Petitioner's sworn testimony that he had his sister's pills in his pocket purely for safekeeping would have violated his ethical obligation to refrain from producing false or misleading evidence, since Petitioner told Eagen during their pre-trial discussions that he used his sister's pills himself (and thus did not just hold them for her).  *Cf. Williams v. Kemp*, 846 F.2d 1276, 1281

(11th Cir. 1988) (counsel's decision not to produce testimony contrary to what his client told him merely fulfilled his ethical obligation to refrain from producing false or misleading evidence and did not constitute ineffective assistance of counsel); *Nix v. Whiteside*, 475 U.S. 157, 164–76, 106 S. Ct. 988, 89 L. Ed. 2d 123 (1986) (an attorney does not render ineffective assistance of counsel by refusing to cooperate with defendant in presenting perjured testimony at trial).

Petitioner also asserts that Attorney Eagen failed to advise him that so long as he testified truthfully regarding the number of his prior convictions, the prosecutor "could not question him any further," including about pending charges (*see* ECF No. 17 at 9). But as Petitioner heard during the on-the-record discussion between the trial court and the parties, the trial court would permit the prosecutor to cross-examine Petitioner about details of his pending charges (i.e., those related to Detective Brunner's undercover buy from Petitioner on May 10th) if Petitioner "opened the door" during his testimony.

Petitioner failed to demonstrate that the state court's rejection of Grounds One, Two, and Three was based upon an unreasonable determination of the facts, or was contrary to or an unreasonable application of *Strickland*. Therefore, Petitioner is not entitled to federal habeas relief on any of these claims.

Petitioner is also not entitled to relief on Ground Four, his "cumulative effect" claim. Cumulative effect analysis should evaluate only matters determined to be in error, not the cumulative effect of non-errors. *See Morris v. Sec'y, Dep't of Corr.*, 677 F.3d 1117, 1132 (11th Cir. 2012) (holding that cumulative error claim fails in light of the absence of any individual errors to accumulate); *United States v. Gamory*, 635 F.3d 480, 497 (11th Cir. 2011) (holding that "[w]here there is no error or only a single error, there can be no cumulative error").

Here, Petitioner has not shown error of a constitutional dimension with respect to any of the alleged errors of trial counsel asserted in Grounds One, Two, and Three. Therefore, Petitioner is not entitled to federal habeas relief on the "cumulative effect" claim asserted in Ground Four.

B.   Ground Five: "Sentencing Mr. Brown to a mandatory fifteen-year term is grossly disproportinate [sic] to the offense of possessing 18 tablets containing hydrocodone."

Petitioner contends his 15-year mandatory minimum sentence is grossly disproportionate to the crime of trafficking 17 or 18 hydrocodone pills (ECF No. 1 at 13; ECF No. 17 at 13–14). Petitioner alleges his sentencing scoresheet scored him at a lowest permissible prison sentence of 48.15 months (ECF No. 17 at 14). He asserts his maximum sentence was 3 years (*id.*).

Petitioner also alleges on July 1, 2014, the Florida Legislature amended Fla. Stat. § 893.135 to lower the mandatory penalties for possession with intent to traffick hydrocodone (ECF No. 17 at 14). Indeed, the Legislature lowered the mandatory minimum sentence for Petitioner's offense to 3 years. Petitioner alleges if he had committed the crime just one month after he was sentenced, he would have received only a 3-year sentence (*id.*). Petitioner states he presented this claim on direct appeal (ECF No. 1 at 13).

Respondent appears to concede Petitioner exhausted this claim in the state courts by presenting it to the trial court in his Rule 3.800 motion, and to the First DCA on direct appeal (ECF No. 13 at 48–51). Respondent contends the state court's adjudication of the claim was not contrary to or an unreasonable application of clearly established federal law (*id.* at 52–55).

1.    Clearly Established Federal Law

The Eighth Amendment of the United States Constitution states that "cruel and unusual punishments [shall not be] inflicted." According to the Supreme Court, this clause "prohibits . . . sentences that are disproportionate to the crime committed." *Solem v. Helm*, 463 U.S. 277, 284, 103 S. Ct. 3001, 77 L. Ed. 2d 637 (1983). However, "outside the context of capital punishment, successful challenges to the proportionality of particular sentences will be exceedingly rare." *Id.* at 289–

90. (quotation and edits omitted).   In *Helm*, the defendant was sentenced to life imprisonment without parole for writing a "no account" check for $100.  436 U.S. at 281.   The defendant was previously convicted of six felonies, including three convictions for third-degree burglary, one conviction for obtaining money under false pretenses, one conviction for grand larceny, and one conviction of driving while intoxicated (third offense). *See id.* at 279–80.  The Supreme Court noted that Helm's crime was "one of the most passive felonies a person could commit. . . .  It neither involved violence nor threat of violence to any person." *Id.* at 296.  Further, all of Helm's prior crimes were nonviolent, and none was a crime against a person. *Id.* at 297.  The Supreme Court stated that when sentences are reviewed under the Eighth Amendment, courts should be guided by objective criteria, including:  "(i) the gravity of the offense and the harshness of the penalty; (ii) the sentences imposed on other criminals in the same jurisdiction; and (iii) the sentences imposed for commission of the same crime in other jurisdictions." *Id.* at 292.   The Court concluded that the sentence of life imprisonment without parole was "significantly disproportionate to [the] crime, and . . . therefore prohibited by the Eighth Amendment." *Id.* at 303.

But years later, in *Harmelin v. Michigan*, 501 U.S. 957, 111 S. Ct. 2680, 115 L. Ed. 2d 836 (1991), the Supreme Court recognized that its 5-to-4 decision in *Helm*

"was scarcely the expression of clear and well accepted constitutional law."  501 U.S. at 965.  The Court went on to conclude that the Eighth Amendment contains no proportionality guarantee, except perhaps in the death penalty context.  *Id.* at 965, 994.  The Court then considered the defendant's argument that his sentence of life imprisonment without parole for possessing 672 grams of cocaine violated the Eighth Amendment, because it was imposed without any consideration of so-called mitigating factors, such as the fact that he had no prior felony convictions.  *Id.* at 994.  The Court recognized that, as with proportionality, an individualized determination that a punishment is "appropriate" is required in the death penalty context.  *Id.* at 995.  However, the Court refused to extend the so-called "individualized capital-sentencing doctrine" to non-capital sentences.  *Id.*  The Court upheld Harmelin's sentence of life imprisonment without parole as constitutional.

After *Harmelin*, the Supreme Court considered Eighth Amendment challenges to non-capital sentences imposed pursuant to recidivist laws.  In *Lockyer v. Andrade*, 538 U.S. 63, 123 S. Ct. 1166, 155 L. Ed. 2d 144 (2003), the Supreme Court considered whether "two consecutive terms of 25 years to life for stealing approximately $150 in videotapes is grossly disproportionate in violation of the Eighth Amendment" when imposed under California's "three strikes" law.  538 U.S.

at 70. The Supreme Court noted that the only relevant clearly established law amenable to the "contrary to" or "unreasonable application of" framework of § 2254(d)(1) "is the gross disproportionality principle, the precise contours of which are unclear, applicable only in the 'exceedingly rare' and 'extreme' case." *Id.* at 73 (citing *Harmelin*, 501 U.S. at 1001 (Kennedy, J., concurring in part and concurring in judgment); *Helm*, 463 U.S. at 290; *Rummel v. Estelle*, 445 U.S. 263, 272, 100 S. Ct. 1133, 63 L. Ed. 2d 382 (1980)). The Supreme Court held that the California Court of Appeal's decision affirming Andrade's two consecutive terms of 25 years to life in prison for a "third strike" conviction was not "contrary to" or an "unreasonable application" of "clearly established" law. 538 U.S. at 76.

In *Ewing v. California*, 538 U.S. 11, 123 S. Ct. 1179, 155 L. Ed. 2d 108 (2003), the defendant shoplifted three golf clubs, each valued at $399. 538 U.S. at 18. Because the defendant had prior convictions of three burglaries and a robbery, he was sentenced to prison for twenty-five years to life under California's "three strikes" law. *Id.* at 20. The Supreme Court considered the gravity of the offense compared to the harshness of the penalty, but noted that the gravity of the offense was not merely shoplifting three golf clubs; rather, it was felony grand theft for stealing nearly $1,200 worth of merchandise after previously having been convicted of a least two "violent" or "serious" felonies. *Id.* at 28. The Court determined that

Ewing's sentence was justified by the State's public-safety interest in incapacitating and deterring recidivist felons, and held that it was not grossly disproportionate and therefore did not violate the Eighth Amendment. *Id.* at 30–31.

Also noteworthy is the Supreme Court's holding in *Rummel v. Estelle*, that the defendant's life sentence imposed under the State of Texas's recidivist statute, upon being convicted of his third felony for obtaining $120.75 by false pretenses and after being previously convicted of passing a forged check in the amount of $28.36 and of fraudulently using a credit card to obtain $80 worth of goods or services, did not violate the constitutional ban on cruel and unusual punishment. 445 U.S. 263, 265–66, 100 S. Ct. 1133, 63 L. Ed. 2d 382 (1980).

Additionally, in *Hutto v. Davis*, the Supreme Court held that the defendant's two consecutive sentences of 20 years in prison upon his conviction of possession with intent to distribute, and distribution of, approximately 9 ounces of marihuana, was not cruel and unusual punishment, where the state statutes authorized a sentence of 5–40 years for each offense. 454 U.S. 370, 374–75, 102 S. Ct. 703, 70 L. Ed. 2d 556 (1982).

In sum, other than the life sentence imposed for the "most passive felony one could commit" in *Helm*, the Supreme Court has not reversed a non-capital, adult sentence for a term of years on Eighth Amendment grounds.

2. Federal Review of State Court Decision

Petitioner presented Ground Five in his Rule 3.800 motion (Ex. D at 146–61). The state circuit court adjudicated the claim as follows:

> Defendant asserts that the 15-year mandatory minimum sentence imposed for Count 1 violates the U.S. and Florida constitutions. Specifically, he asserts that the mandatory minimum sentence is grossly disproportionate to the crime committed and, therefore, constitutes a cruel and unusual punishment.
>
> In *Sanchez v. State*, 636 So. 2d 187 (Fla. 3d DCA 1994), the defendant was convicted of Trafficking in Cocaine and was sentenced to life in prison without the possibility of parole. The defendant in *Sanchez* asserted that section 893.135(1)(b)(2), Florida Statutes (1991), was unconstitutional, in part, because its penalty provisions amounted to cruel or unusual punishment. *Sanchez*, 636 So. 2d at 188–189. Citing multiple cases, the court found that, ". . . section 893.135 does not violate the ban on cruel and unusual punishments," and reasoned that, "[a]s to the issue of cruel and unusual punishment, numerous courts have found that the mandatory minimum sentences provided for in the drug trafficking statute do not violate the state and federal constitutional ban on cruel and unusual punishments." *Id.* at 189.
>
> In the instant case, Defendant committed Trafficking in Hydrocodone in violation of section 893.135(1)(c)1.b., Florida Statutes (2011). Although subsequently decreased by the legislature, the mandatory minimum term of imprisonment for Defendant's crime (Count I, committed on or about 05/10/12) is 15 years. The legislature has broad authority to determine the maximum and minimum penalties for crimes. See generally *State v. Benitez*, 395 So. 2d 514, 518 (Fla. 1981 ); see generally *Adaway v. State*, 902 So. 2d 746 (Fla. 2005); see generally *Andrews v. State*, 82 So. 3d 979, 984 (Fla. 1st DCA 2011). Defendant's sentence is not grossly disproportionate to his crime. Furthermore, any gap between the gravity of Defendant's crime and the harshness of his sentence is significantly less than the gap that existed

> in *Solem v. Helm*, 463 U.S. 277, 103 S. Ct. 3001 (1983). Defendant's sentence does not constitute cruel and unusual punishment.

(Ex. D at 162–64). Petitioner presented this issue as his sole claim on direct appeal (Ex. E). The First DCA affirmed the judgment and sentence without written opinion (Ex. H).

Petitioner is correct that his lowest permissible prison sentence was 48.15 months (4 years) (*see* Ex. A at 65–67). But contrary to his assertion, the statutory maximum sentence for his conviction was 30 years in prison, not 3 years. *See* Fla. Stat. §§ 893.135(c) (effective April 29, 2002 to June 30, 2014); 775.082(3)(b). Petitioner's 15-year mandatory minimum sentence was not a life sentence, and it was within Florida's statutory limit. Further, unlike *Helm*, Petitioner's offense (trafficking in more than 14 grams but less than 28 grams of hydrocodone) was not the "most passive felony one could commit."

Petitioner has not demonstrated that the state court's rejection of his proportionality claim was contrary to or an unreasonable application of clearly established federal law. Therefore, he is not entitled to federal habeas relief on Ground Five.

IV. CERTIFICATE OF APPEALABILITY

Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant," and if a certificate is issued "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)." 28 U.S.C. § 2254 Rule 11(a).  A timely notice of appeal must still be filed, even if the court issues a certificate of appealability.  28 U.S.C. § 2254 Rule 11(b).

"Section 2253(c) permits the issuance of a COA only where a petitioner has made a 'substantial showing of the denial of a constitutional right.'"  *Miller-El v. Cockrell*, 537 U.S. 322, 336, 123 S. Ct. 1029, 154 L. Ed. 2d 931 (2003) (quoting § 2253(c)(2)).  "At the COA stage, the only question is whether the applicant has shown that 'jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'"  *Buck v. Davis*, 580 U.S.—, 137 S. Ct. 759, 773, 197 L. Ed. 2d 1 (2017) (citing *Miller-El*, 537 U.S. at 327).  The petitioner here cannot make that showing.  Therefore, the undersigned recommends that the district court deny a certificate of appealability in its final order.

The second sentence of Rule 11(a) provides:  "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should

issue." Thus, if there is an objection to this recommendation by either party, that party may bring this argument to the attention of the district judge in the objections permitted to this report and recommendation.

Accordingly, it is respectfully **RECOMMENDED**:

1. That the petition for writ of habeas corpus (ECF No. 1) be **DENIED**.

2. That a certificate of appealability be **DENIED**.

At Pensacola, Florida, this 5th day of August 2019.

/s/ *Elizabeth M. Timothy*
**ELIZABETH M. TIMOTHY**
**CHIEF UNITED STATES MAGISTRATE JUDGE**

**NOTICE TO THE PARTIES**

**Objections to these proposed findings and recommendations must be filed within fourteen (14) days after being served a copy thereof. Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control. A copy of objections must be served upon all other parties. If a party fails to object to the magistrate judge's findings or recommendations as to any particular claim or issue contained in a report and recommendation, that party waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions. *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.**